And I believe we are ready to begin with our first case, Bartlett v. Honeywell International. Good morning, may it please the court. Kenneth McCallion, McCallion & Associates for the plaintiff appellants in this particular case. Plaintiffs seek a reversal, reinstatement of their amended complaint and a remand to state court. We submitted a letter recently indicating the reasons why we believe that no jurisdiction lies with the court. If there were any federal issues, those were long disposed of when the district court denied plaintiffs' requests for injunctive relief, leaving at least several years ago only the state law common law claims which had been pleaded by the plaintiffs in state court and which had been removed. Could you address diversity jurisdiction, why there is not diversity jurisdiction here? Yes, on diversity jurisdiction, at least two of the plaintiffs had moved out of state, the Harts, Mr. and Mrs. Hart, prior to the filing of the amended complaint. And so they were not New York citizens or residents. In addition, we have argued and given details that Honeywell itself, at least as far as its center of activity or locus, particularly relating to this matter, was in Syracuse, New York, notwithstanding that it had been incorporated in another state. So we believe there's no federal jurisdiction, either substantive or on a diversity basis, and that the court exercised, did not properly exercise its discretion in retaining jurisdiction over the state law claims under ancillary or pendent jurisdiction. To the extent- You're saying that mere presence of a corporation is enough to destroy diversity, that we look at more than the place of incorporation and the principal place of business? When the locus of activity, of business activity, particularly relating to the particular matter, as we indicated in our papers, Honeywell, in all its filings with the state, indicated that its office in Syracuse would be the location for contact, for formal notices, etc. Why does that matter? That suggests that they can create their own jurisdiction and destroy their own jurisdiction by saying where the documents are going to be delivered. Yes. Well, we cited two cases relating to that. I don't think that it's as, frankly, as your questions indicate, it's not as strong an argument as the issue that the court failed to remand and did not exercise its discretion properly by not remanding after only state law claims arose. The plaintiffs had chosen their jurisdiction. It's law that plaintiffs have a right to choose their jurisdiction. It was in state court. It was removed. To the extent that the case impacted any of the remediation activities of Honeywell, that was long disposed of when the court denied any injunctive relief, and then Honeywell announced that it had finished the remediation. I'm sorry. Aren't you here asking them to do just that on our remand? Aren't you still after the injunction? Isn't that something you would like to have us pave the way for? Oh, no. No. It would be moot at this point. It's already done. Right. The remediation finished. In fact, Honeywell announced, I think it's over two years ago now, that it had finished the remediation, and then the court declared as moot any applications that we had. We then moved for a remand at that point after any of the issues relating to injunctive remedies. So we're down to negligence, nuisance, and trespass, and we believe strongly that CERCLA, as well as state common law, preserves and protects, and it was Congress's intent through the savings clauses, to protect common law causes of action. And certainly those savings clauses, as we recited, are not only in Section 301E1 and 302D of CERCLA, specifically preserving and saving the right of common law claims. Well, the appellee argues that the complaint here, in essence, alleges that the remediation required by the consent decree didn't have sufficient protections in it to protect your clients against possible contamination. So why isn't that the right way to frame the allegations in the complaint? This is really about your client's disagreement with the agency's decision, and if I understand correctly, to go with the geotubes, their decision not to require additional testing and the like. No. Our amended complaint was very carefully crafted, leaving aside reading between the lines. I mean, I can tell you that the plain language, we went through it very carefully. And indeed, the court, in its lengthy decision, to the extent it's citing to our amended complaint, it says specifically that what we're complaining of is negligence in the remediation ordered in the consent decree and in the mitigation plan. For example, we never in the amended complaint attacked or critiqued the issue of whether geotubes were used. What we said in the amended complaint was that specifically in the consent decree and in the health and safety plan which was issued, it was represented by Honeywell, accepted by the state, that the geotube system would be a closed system and, in fact, that there would be no contamination releases directly from the geotubes themselves, just perhaps some secondary release from the water. In the summer of 2012, it became readily apparent to the state and to the residents, plain of community in the area, that there were being direct it was not a closed system, there were being direct releases from those geotubes. Indeed, we submitted in the court below, and I think it's in the record on appeal, videotapes and photographs of a pressurized spray, contaminated spray rising above the particular tree level. In following up on that, Honeywell says that in its community health and safety plan that was approved by DEC that it acknowledged there would continue to be some volatilization of chemicals and contaminants and that pumping the sediments into the tubes would minimize the amount of contaminants that are exposed and that there may be some volatilization nonetheless thereafter. I didn't see in the plan itself, although the plan after the shutdown did seem to require a covering to be placed on the tubes to minimize the odor and contamination, it didn't seem that there was any notion that they would be hermetically sealed and that nothing would get through. Why don't those mentions in the plan suggest that you're taking an overly aggressive position about exactly what was promised in the 2013 plan that you say they didn't abide by? We were very careful in our drafting on the amended complaint that Honeywell represented that it would be a closed system in many public meetings, many of its releases. Yes, if you look specifically at the consent decree and in the health plan, it talked about some secondary releases from the water during the dewatering plan but not directly from the geotubes. But leaving that particular issue aside, after there was massive contamination and the whole remediation plan was shut down in the summer of 2012, there was a mitigation plan put forward by Honeywell, accepted by the state. They let them restart. On the specific representation, that nonpermeable covering, tarps basically, would at that point, which you're correct, had not been done before because there were these massive releases, those would be put over the particular geotubes and it would finally be a closed system. But we've had a debate about what's a closed system, and you're saying that in 2013, the new plan, the odor mitigation plan, I guess, was in fact not implemented. Exactly. And so you're saying that Honeywell did not conform itself to the actual consent decree as modified by the odor mitigation plan in 2013. Absolutely. Because I think I tend to, I didn't see promises that there would be absolutely no contamination released into the atmosphere. And when you talk about closed system, I hear you saying that that means absolutely none would come through. But you're making a more basic point, which is they promised to cover the geotubes and they didn't do it. They did. It was their fallback position. They originally said we don't have to cover the geotubes because there will be no direct releases from it. That was belied by the fact that there were massive releases in the summer of 2012. We had massive illnesses in our community. The DEC stepped in, stopped it, and then ordered a plan to be, you're right, the mitigation plan requiring coverings. Was that plan adopted? I see the proposed mitigation measures by Honeywell as an additional odor mitigation plan, which looks like a proposal, but that was adopted by the DEC or EPA? Yes, in order for them to restart the remediation and start pumping the effluent. They had, in fact, Honeywell proposed that plan. It was accepted. But the amended complaint alleges, and again, there's been no discovery on this case at this point. We're just at the pleading stage. But the amended complaint alleges in good faith, and we think correctly, that there was not a complete covering at that point and that. You say in paragraph 228 that it was observed by one of the plaintiffs that the comprehensive and integrated geotube covering system had not been installed for the majority of the geotubes. That you say is contrary to what the state had approved and required. Right, at that mitigation. I'm sorry. Finish. Yeah, at the mitigation plan level. This is post-2013. If that's the case, do you then have that they did not properly follow the orders? Do you need negligence then after that? I mean, wouldn't the mere fact that they didn't follow the plan be enough basis for you to bring a lawsuit? Yes, per se negligence. And perhaps we would have amended with strict liability. We're dealing about very dangerous contaminants here. I'm just wondering, as a matter of the structure, which is fairly complicated, whether if the injury was due to failure properly to follow the consent decree, would you need state common law in order to bring that action, or could you bring it on the grounds that that circular had been violated? Basically, we would have to bring it as common law claims, leaving aside the possibility of citizen suits. But we brought it originally as common law claims. And circular, actually, I'd like to refer to both section 107J and section 119, which specifically address the issue raised by Honeywell, that, well, we're basically immunized from remediation. This isn't part of the original contamination in the lake. This was part of the remediation. And we cited specifically to the Environmental Conservation Law ECL section 27, which addresses the issue of remediation where a contractor or a PRP, potentially a responsible party, basically gets a free pass, but not for negligence, nuisance, or, in this case, trespass. So, again, there's a savings clause. I think I understand that. But I'm just wondering whether, supposing there was an absolute violation, they did no testing at all for anything, absolute violation, would you then, if you were bringing a suit on behalf of these people, would you be able to bring it under the federal statute, federal law, or could you only bring it under common law? Really only common law. I'm a common law lawyer, more a state lawyer. My colleague, Mr. Larson, is familiar with there are procedures for bringing citizen suits, notice, et cetera. There's kind of perhaps administrative-type remedies, but common law remedies are preserved by the savings clauses of 107 and 119. My fault is not your fault, but I'm having a little trouble distinguishing between what would happen if your position was that they did everything they were required under the consent decree in CERCLA, but nonetheless they acted negligently or trespassed. That's one thing to me. It's another thing to say that they didn't follow CERCLA and you're bringing a lawsuit. I'm trying to figure out which one it is. Only the latter, if I'm hearing you correctly, that it was negligence, failure to perform and conform to the requirements of the consent decree and the mitigation plan. All right. It's failure to conform. It isn't that they conformed, but that wasn't enough. Oh, no, absolutely not. I understand your confusion because the district court at times in its lengthy decision said that's what we said, but then it cites to our amended complaint and says, of course, the plaintiffs allege that there's negligence in the implementation, but looking at the totality of the complaint, even though the plaintiffs don't say it, I'm going to read between the lines and say, well, they're really attacking the remedy. Perhaps the confusion is that the plaintiffs, long before they brought this particular lawsuit, some of them were outspoken in public meetings and there was a wide-ranging debate up in the Syracuse area there as to what the proper remedy would be. However, that was decided when the consent decree was signed and Judge Scullin signed that consent decree and we accepted that we basically had to accept that remedy at that point, but we and our experts carefully looked at the implementation of that consent decree and the mitigation plan and we think in a very rigorous manner, it's an eighty-two page complaint with exhibits A through Z. I didn't do this all myself. We had to have consultants to carefully go through the consent decree and we think if our complaint, if the well-pleaded allegations are accepted as true at this point, that this court should definitely remand, reinstate the complaint. At least in part because the consent decree was not adhered to by Honeywell. Correct. We point to three major areas. One has to do with the closed system issue, which we've already discussed, which if that was still an ambiguous issue, was we think our case was even stronger with the mitigation plan. Then in the consent decree, there's perimeter error testing and they discontinued bench tests, a little bit more technical, but our experts told us and we had a good faith basis. We included it in the complaint. But isn't perimeter error testing a monitoring that's treated as a remedial measure that certainly requires the responsible party to adhere to and not to modify? No. If I understand you correctly, yes. It requires a very rigorous perimeter error testing system. But if there's a consent decree that provides for perimeter error testing, that is a remedial measure and my understanding of the statute was that the responsible party has to follow what, to the letter, the perimeter error testing that is prescribed by the consent decree and you were saying that it ultimately became not state of the art and so was inadequate, but to conform to your wish, Honeywell would have to deviate from the consent decree. Is that incorrect? It's incorrect. That was a characterization by the district court and by Honeywell. There may have been a time early on before the consent decree when publicly we were urging a more state of the art system. Is that the T-016 system or am I reflecting back to another part of the record? Yeah, that had been one of the alternative systems which . . . That the plaintiffs were urging should be used. But not alleged in the amended complaint. We were stuck with a system that they had, but that . . . Right, I'm just going to say that there can be some confusion based on the fact that there were plaintiffs during the notice and comment period who were challenging various aspects of the consent decree. So just making sure I understand the record correctly, the plaintiffs in the original complaint were also seeking injunctive relief and in that context they wanted both to enjoin Honeywell from transporting and dumping waste at the waste bed and from implementing and directing that they implement particular systems. But you're not now urging that that's a part of this complaint? Oh, absolutely not. And I think some of the court's thinking maybe was a holdover from early proceedings on the injunction. But there's nothing cited in the amended complaint that the court could find specifically, the specific words, where we did not fully accept the parameters, albeit perhaps deficient, in the consent decree and the mitigation plan. And then what we did was we had our experts go in and say, okay, we're stuck with this plan, now let's see whether they have properly implemented that. And among other things, we argue that with regard to the geotubes, that they did not continue air testing or bench testing, as they call it, after they made that decision. They represented that they would, as we allege in the consent decree. They didn't continue that and it kind of slipped through and we ended up with massive air emissions in the summer of 2012. If that's so, if what you're really talking about here is a failure to live up to the federally approved consent decree. Oh, absolutely. Why is preemption an issue? Why is it an issue? Oh, well, because. I think you're supposed to say it's not. Oh, I'm sorry, it's not. There's no federal preemption because of the saving clauses, several of them, not only relating to. I thought you were saying, I'm sorry, maybe I. I'm sorry, I'm suffering from a cold here. I'm having trouble perhaps. I'm suffering from having awakened this morning, period. If the problem here is that they did not, the Honeywell did not properly follow the consent order, then you're bringing. The issue seems to me of diversity of citizenship falls away because that's not the basis of this. The basis of this is circling and the failure of Honeywell to properly act, not under the common law, but under the consent decree and circle. Well, the issue is whether common law remedies go not only to the original pollution issue, the original contamination, but also apply to a remediation in the context of a circle and consent decree ordered one. You identify an issue which there isn't a lot of law on, and basically that's why Honeywell argues that they get a free pass or an immunization if it relates to the remediation, but the courts have addressed this, New York State cases and some federal cases that the savings clauses which give us common law remedies not only apply to the underlying contamination, but to the remediation. So you are depending on the common law for essentially for the relief that you get. Oh, absolutely, but the standard of care, there's no tension between the federal and state law because the standard of care in the community health plan in the case of CERCLA, as well as at the common law, is a duty of care to act reasonably to protect those who are within the target area. And in this case, unlike the gun case, the Beretta case, for example, the community health and safety, clearly our community was the third party, the third party beneficiaries of the community health plan and the consent decree itself. There was a duty of care which they have, and it's both explicit in the CERCLA law, 107-109, and the savings clauses, and certainly explicit in state law, ECL 27. So the cases cited, we would argue, where federal courts, really not in this jurisdiction, but in other jurisdictions, found some tension between state law remedies, and federal is not present here, especially since the remediation is done. There's no way we can interfere with it. Whatever happened, happened at this point. We're merely arguing that we were injured, which is quite clear, certainly we allege it, and the DEC, seeing nosebleeds and people going to the hospital, shut down properly the remediation. The question is, is there a... For every wrong, is there a remedy? And I think the law tries to reach, to find a remedy if there is a wrong, and fortunately under, we think, both state common law and under CERCLA, that our plaintiffs have a jurisdiction and standing to seek plain old breach of duty injury and damages under the common law. Thank you. Good morning, Your Honor. My name is Brian Israel, and I represent Honeywell. The plaintiff's catalog of concerns might be quite compelling in some cases, but in this case, Your Honor, the plaintiffs have raised these precise concerns over the last half-dozen years. Emissions that were attended to geotubes, the air monitoring system, and the risk assessment have all been raised by the plaintiffs to the DEC, to the United States EPA, to the district court, and to the Department of Health, and in all cases, these agencies respectfully listened to the plaintiff's concerns, analyzed those concerns, and decided that they were without merit. Could you focus for a minute on the 2013 odor management plan and the representation there that the additional mitigation measures, this was after the shutdown occurred because the first measures were not working, that they will include a significantly expanded and improved cover system, and that will... And there's a description that there will be channel covers and geotube channel covers, various kinds of covers, which suggested to me on top of the tubes themselves. And the allegation and the complaint in paragraph 228 that in September 2014, after that plan, I gather, was approved by the state and the EPA, that the comprehensive and integrated geotube covering system had not been installed on the majority of the geotubes. What's your position? Was it in fact installed, or was it not? Or was it not a requirement of the consent decree as modified by the OMP? How do you respond? Yes, Your Honor. As the Tenth Circuit acknowledged in the New Mexico v. G.E.K., Superfund remedies are highly complex, they're dynamic, they're changing, and in this... I appreciate their complexity. Yes, Your Honor. And in this case, there were contingency measures that were identified, in fact, before the remedy was commenced and then that were implemented as part of the odor mitigation plan in 2013. But I need to just understand, you know, did you promise to cover the geotubes and then not do it? No, Your Honor. What happened was Honeywell implemented a covering system that was implemented at the site, over time, at the direction of the DEC, who was on site in the field with Honeywell, as appropriate. So it's not the case that as the geotubes are filled up with the slurry... These, by the way, are very, very large geomembrane containers, about the size of two train cars, where 2 million cubic yards of slurry are pumped into the geotubes. There were about 979 geotubes utilized. And they're covered as appropriate at the appropriate times. You need to allow the water to drain out. That's the purpose of the geotube. The water is then treated, is collected and then treated. But the covering system that was in place was a gradation of different technologies and different methods at the direction, always at the direction of the DEC, Your Honor. And that was done appropriately. As the EPA found... So you're saying the odor mitigation plan didn't promise a comprehensive covering system, like an additional system of tarps over the geotubes? That's kind of what I read it to mean. Your Honor, it required additional measures, including covers and misters and other techniques and methodologies. And those covers were put into place at the appropriate time. It's done appropriately under DEC supervision as the geotubes are filled up. But of course you have to... And there are also different types of covers that were utilized. The EPA, after the odor mitigation plan was implemented, found that all of the methodologies used to protect public health were done appropriately on the face of the plaintiff's complaint. And there... But the complaint, which we are bound at this stage to take plausible allegations as true, says that a plaintiff observed that the comprehensive and integrated geotube covering system had not been installed. And we look at the OMP and it says one will be installed. Now, I understand that it's complex to install. It's a large operation and so on. But I was concerned at the district court's kind of ready dismissal as the plaintiffs were seeking something other than simply compliance with the plan of this kind of allegation, which seemed to me much more specific. And, you know, why isn't that enough to allow them to go forward? It doesn't seek to impose an obligation that's in conflict with the plan. On the contrary, and you say that this was what the plan called for, it just is a little more complex than represented and addressed in the allegation. Because, Your Honor, we believe that allegation in 228, taken in the context of the entirety of the complaint, is not a plausible allegation because the DEC has stated that Honeywell complied with the remedy. The EPA, a year after the odor mitigation plan, said that Honeywell was complying with the remedy. And the district court, whose obligation it is to enforce this consent decree, found that Honeywell was in compliance with the remedy. This particular remedy, there were specific findings by the DEC and EPA? With respect to the remedy writ large, Your Honor. No, no, I mean with respect to the covering aspect of it. Or are you just saying there was a general finding of compliance? There was a general finding of compliance. There was a general finding that the air met all the standards that were required to be met and that the remedy was protective of human health and the environment. Not specific. You're saying that any allegation of noncompliance or negligent compliance with the plan runs afoul of that and creates a conflict? In the context of this complaint, which included 1,600 pages of materials, including responses by the EPA and an FAQ, responses by the Department of Health and an FAQ, responses by the DEC, and also a letter to plaintiff's counsel stating that the remedy was being done in a manner that's protective of human health and the environment. In the context of the entirety of this complaint, that allegation and all of the allegations are implausible and appropriate. Can that determination be made just on the face of the complaint, or are you relying on additional materials that would appropriately be the subject of judicial notice? I'm relying entirely on the face of the complaint, including the 1,600 pages that the plaintiffs added to the . . . attached to the complaint. However, if the court were to take judicial notice, there's been a five-year review by the EPA that also concludes that the remedy was done. There was an amicus brief filed by the DEC also concluding that the remedy was done in a manner consistent with the consent decree and in a manner that was protective, as well as, of course, the district court's finding. Would you have said the same in 2011 or early 2012? I'm curious about what led to the shutdown in 2012 and the need for the odor mitigation plan and additional steps. It goes back to the conversation we were having earlier about the dynamic nature of a Superfund site and the dynamic nature of a Superfund remedy. There wasn't a shutdown in the sense that the remedy was called into question. There was a temporary halt for the DEC and for Honeywell to identify additional measures that could be taken to address odors. There was never a concern by the EPA or the DEC that people were being harmed. In fact, quite the opposite. The EPA, upon hearing the plaintiffs' concerns, reconducted their risk assessment that's in the complaint and found that there was no harm to the public or to the plaintiffs. What's your position on the question whether an individual plaintiff has a remedy under CERCLA or under state law for noncompliance with a plan? Say the EPA didn't issue a finding or DEC didn't issue a finding that there was compliance with the plan and a plaintiff thought there were supposed to be all these covers. I don't see any covers. I smell bad stuff, and I think I'm getting hurt. I'm taking my kids to the emergency room, so I'm going after the implementer. What remedies are available to such a person? In our view, Your Honor, if a PRP who is implementing a remediation, in this case a $451 million cleanup plan, fails to implement that remedy, that they would not have the benefit of the conflict preemption. The conflict preemption that we are arguing stems from, as the district court found, as the Fourth Circuit found, stems from the fact that Honeywell was complying with the law and should not be held liable at state law for complying with the federal law. Would such a person then have both state and federal remedies? Such a person would have state remedies, potentially, and such a person would have the federal remedies, which these plaintiffs have, which is a citizen suit provision. Supposing they took an additional step in the interest of safety, an additional step not considered by the DEC, would that be permissible? That is to say, would they then, by taking an additional step, be acting in conflict with the circuit? Yes, Your Honor. Under 122E6, a potentially responsible party is prohibited from undertaking any remedial action without the authority of the president, in this case the EPA and the DEC. That has a funny ring to it. Yes, Your Honor. But Honeywell has no choice. In the context of a Superfund remedy, which, by the way, the entire structure of Superfund is designed to incentivize companies like Honeywell to undertake a Superfund remedy and to address legacy pollution. As the Second Circuit has found, that's part of the structure of CERCLA. Part of that – So they would have – I'll let you finish. So they would have been in violation had they by themselves gone without DEC permission or appropriate permission by the president. They would have been in violation had they done something without that sort of Yes, Your Honor, and for good reason, because when Congress enacted CERCLA, they wanted to authorize and enable the environmental agencies, the experts here, to have complete control over the remedy. For us, perhaps, it sounds maybe more is better, but more is not always better. The technology, for instance, that the plaintiffs have proposed is a technology. They call it state-of-the-art, but, in fact, it leads to false positives. And the agency, the EPA, has an interest in ensuring that air monitoring is not just comprehensive but also reliable. If they were going to put burlap over all of this, the way they had to do it was to go and get permission first and then do that. And can they be negligent by not seeking permission? No, Your Honor. There's a very prescriptive, first of all, in the burlap example, we all think burlap might sound like a good idea, but there may be downsides to burlap. If somebody takes my word for using burlap, we're in a lot of trouble. The point is, Your Honor, that something that might seem like a good idea to us will not be a good idea because there are advantages and disadvantages to every remedial technology, every remedial strategy, every part of the cleanup. But not to air quality testing. Testing is neutral, right, in this scheme that you're describing. It's not a remedial measure. I respectfully disagree. Air monitoring is part of the remedial measure. I didn't say monitoring. I just said doing testing before implementing. Testing is part of the Superfund remedy for the following reason. The agencies have an inherent interest ensuring that reliable information is communicated with the public. It is not in the EPA's interest or the DEC's interest to have testing done that's not reliable that could result in false positive. False alarms have adverse consequences. I'm not talking about monitoring after the fact. I was looking at the definition of remedy or remedial action, which includes monitoring. Yes. It's required to assure that such action is prepared. But you did bench testing at the early stage, right? Yes. And then you changed going from the open pit to the geotubes, right? Yes. And there's an allegation that you didn't continue, that Honeywell didn't continue the full amount of testing that they should have done with regard to additional compounds there. Yes. So I don't see the kind of testing that the plaintiffs are talking about in that instance. Do you consider that a remedial measure that you can't do except under EPA supervision? Yes, Your Honor. In addition to that, those exact issues were raised by Mr. Larson in his letter to the EPA in the complaint. I direct the Court's attention to Appendix 1046, where the EPA responded to exactly the allegations. You didn't test for mercury. You didn't test for PCBs, et cetera. And the EPA, in 2014, said to Plaintiff's Counsel, and I'm going to read if it's okay, during the period of dredging operations. Can you slow down just a minute? Sure. We might look at the same time. Yeah, this is 1046 of the Plaintiff's Complaint in the Joint Appendix. Thank you. During the period of dredging operations, there has been no evidence of adverse impacts to human health. An extensive air monitoring system has been in operation at the SCA perimeter prior to the start of dredging. Data has been and continues to be collected at multiple monitoring locations continuously during dredging. To date, the extensive air monitoring data demonstrates that contaminant air concentrations for all parameters of concern have been below conservative levels. And then skipping down, this further demonstrates that the project is being implemented in a manner which is fully protective of public health. This is the EPA responding to Plaintiff's Counsel's, on behalf of a different client, Plaintiff's Counsel's assertions in a letter of notice of intent, a citizen suit, that the allegations were unfounded, in EPA's words, inaccurate and unfounded. And where on the page is the inaccurate and unfounded? On page 1045, sorry, Your Honor, the prior page. The second paragraph, Dear Mr. Larson, your two letters include numerous inaccurate or unfounded statements. This is one example, and there are many others in the complaint. The FAQs from EPA and the Department of Health, the FAQs from DEC, which demonstrate that the allegations that the plaintiffs have asserted here are implausible. And therefore, we ask the court on a 12v6 motion to affirm the district court's finding that Honeywell was preempted from doing anything other than what it was required to do and should not, therefore, be held liable for state tort damages. Thank you very much. If I may, the only action that the plaintiffs could take for the damages that they suffered was really at common law, because I'm reminded that citizen suits are not damage actions. They're merely looking for recovery if you spend money for resource damages or for expenditures that you make. But I think your adversary is saying that Honeywell could not follow the measures that you say would have been non-negligent because they would have then been in violation of circuit. No, absolutely not. In fact, on the tarp covering, I'm sorry, the covering of the geotubes, we argue in the complaint, we allege, we think fairly, that the consent decree required any emissions to be de minimis, and certainly after the mitigation plan was implemented, we also . . . But does the record show that EPA and DEC found Honeywell to be in violation of precisely this allegation? No, not precisely on that allegation. Was there an overall overarching that, by and large, they have complied? But this is largely a self-policing type of system. This isn't a command and control by the DEC. There are communications back and forth. Our people were out there. We're the ones who were the policemen, in a sense. We blew the whistle on these massive releases in the summer of 2012, which led the DEC to close it down. It was information provided by us. There were thousands of calls by our people and other neighbors to the DEC hotline, which forced it to shut down. So we were there in the direct line of fire. And also, many of our people went to the hospital. There are injuries, so we allege it, and it's well documented. The real issue is that, if it's in the context of a remediation, is there a remedy which we may pursue for our damages? Now, again, this is just at the pleading stage. If at trial, presumably Honeywell will say, well, we were given a free pass by the EPA or the DEC in Albany on this, in a very general sense. So these allegations of specific injury that the TARP covers, for example, of the geotubes, it was a moving target. Honeywell said initially we could do it, but we don't think it's necessary. There's only going to be de minimis. It's going to cost many more millions of dollars, so we're going to keep that as a contingency plan, kind of in our back pocket. We'll do it if necessary. Well, our planners were the guinea pigs. They were the canaries in the mine. They were suffering, and Honeywell said, oh, okay, I guess our plan isn't. So we're going to do a full covering. The evidence we put in this voluminous record, by the way, with no discovery yet, indicates that there was only a 10% covering, that we ran into documents saying that Honeywell had back orders for these TARPs, for these nonpermeable coverings. They did not have enough of them. There was this delay even after they ---- Is that in the record? It's in the mitigation plan itself. The 2013? Yes, where basically they're saying we will do a full covering at that point. I'm referring to the back orders, that they were unable to procure the covers that they had. Yes, there were back orders by the manufacturer. But surely that isn't in the plan. It is in the mitigation plan backup documents, which I had the specific site. But in any event, this was the reason why Honeywell could not do a complete covering at that point. So it's largely a self-policing system. It's not like DEC inspectors are out there 24 hours a day. We were injured. They have their defenses. We just want a reasonable opportunity to try and make our case that they negligently engaged in the remediation process and violated their representations and promises in the consent decree and in the mitigation plan. Thank you very much. Thank you both. Very well argued. Thank you for helping us understand the complaint.